SMITH v. GLENN.
No. 1811.

District Court, W. D. Kentucky.
July 2, 1936.

Stoll, Muir, Townsend & Park, of Lexington, Ky., for plaintiff.

Mastin G. White, Sol., Department of Agriculture, J. P. Wenchel, Asst. to Sol., Department of Agriculture, and Robert B. Tyler and A. M. Wilding-White, Attys., Office of Solicitor, all of Washington, D. C., Robert H. Jackson, Asst. Atty. Gen., Robert N. Anderson, Sp. Asst. to Atty. Gen., and Bunk Gardner, U. S. Atty., and Oldham Clarke, Asst. U. S. Atty., both of Louisville, Ky., for defendant.

HAMILTON, District Judge.

This cause coming on regularly for trial, and all the facts having been stipulated, Richard C. Stoll, Esq., Wallace Muir, Esq., William H. Townsend, Esq., and James Park, Esq., having appeared as attorneys for the plaintiff; Robert H. Jackson, Assistant Attorney General, Mastin G. White, Solicitor, Department of Agriculture, J. P. Wenchel, Assistant to the Solicitor, Department of Agriculture, Robert B. Tyler, Attorney, Office of the Solicitor, A. M. Wilding-White, Attorney, Office of the Solicitor, and Robert N. Anderson, Special Assistant to the Attorney-General, having appeared on the brief for defendant; and Bunk Gardner, United States Attorney, and Oldham Clarke, Assistant United States Attorney, having appeared as attorneys for defendant; a jury having been duly waived by the parties hereto by a stipulation filed with the clerk of the court, the issues of law and fact herein having been duly tried before the court, the case duly argued and briefed, motion for special findings of fact having been duly made by counsel on behalf of each of the parties hereto, and the court being fully advised now makes the following findings of fact and conclusions of law:

Findings of Fact

1. The plaintiff is a citizen of the state of Kentucky and a resident of the Eastern District of Kentucky.

2. The defendant, Selden R. Glenn, is a citizen of the state of Kentucky, and a resident of the Western District of Kentucky.

3. The defendant Selden R. Glenn, at the date of filing the original bill of complaint herein and at all times thereafter, has been and is now the duly appointed, qualified, and acting collector of internal revenue for the United States for the Collector's District of Kentucky.

4. The matter in controversy in this cause amounts to $607.08, exclusive of interest and costs.

5. The plaintiff, during 1930, 1931, 1933, and 1934, has been regularly engaged each year on a farm owned by him in the raising, producing, and selling of Burley tobacco, being tobacco of the kind classified as "Type 31" in service and regulatory announcement No. 118 of the Bureau of Agricultural Economics of the United States Department of Agriculture (hereinafter referred to as "Burley tobacco"), and desires and intends to continue so to do. In each of said years, the plaintiff planted 15 acres of said farm to tobacco, and in each of said years, except 1934, the plaintiff raised approximately 15,000 pounds of tobacco on said farm. In 1934 the plaintiff raised 14,052 pounds of tobacco on said farm.

6. No contract between the plaintiff and the Secretary of Agriculture was entered into. On October 6, 1934, plaintiff filed with the county committee for Fayette county an application for tax-payment warrants for the farm owned by him on which he raised tobacco as aforesaid, under section 5 (b) of the Kerr-Smith Tobacco Act

(see 7 U.S.C.A. § 755 (b), hereinafter referred to as the act, but this application was rejected and he received no tax-payment warrants. The reasons assigned by said committee for the rejection were: (1) That plaintiff had a base of 11.25 acres which was 15.3 per cent. of his farm. This is a much larger base than the average in the community. And (2) that it would be unfair to the contract signers to give farmers in plaintiff's position exemption when over 50 per cent. of farmers in Fayette county have a smaller base than plaintiff's, compared with the size of the farm. A true and correct copy of said application and of the rejection thereof appears as Joint Exhibit 1.

7. Plaintiff, on December 18, 1934, sold 10,606 pounds of Burley tobacco, Type 31, harvested by him subsequent to June 28, 1934, at public auction at the warehouse of Geary-Wright Tobacco Warehouse Company in Lexington, Ky., for the sum of $1,853.23, which sale was the first bona fide sale of such tobacco. Said warehouse company deducted from said selling price the sum of $463.30, being 25 per cent. thereof, and paid that amount on said date to defendant Selden R. Glenn as collector aforesaid, pursuant to provisions of the Kerr-Smith Tobacco Act (Act of June 28, 1934, c. 868, 48 Stat. 1275, see 7 U.S.C.A. §§ 751–766). Thereafter, on January 2, 1935, plaintiff sold 3,446 pounds of Burley tobacco, Type 31, harvested by him subsequent to June 28, 1934, at public auction at the warehouse of Geary-Wright Tobacco Warehouse Company for the sum of $575.-15, which sale was the first bona fide sale of such tobacco. Said warehouse company deducted from said selling price $143.78, being 25 per cent. thereof, and paid that amount to said defendant pursuant to the provisions of said act. Thereafter, or on March 21, 1935, the plaintiff filed a claim for refund for said taxes, which claim was rejected by the Commissioner of Internal Revenue on April 26, 1935.

.8. On July 3, 1934, the Secretary of Agriculture, pursuant to section 3 (a) of said act (7 U.S.C.A. § 753 (a), determined and proclaimed that the declared policy of said act would best be effectuated by the levy of the tax provided for therein during the crop year 1934–35 at a rate of 25 per cent. of the price for which tobacco, with respect to which the tax is applicable, is sold.

9. The Geary-Wright Tobacco Warehouse Company deducted from the sale price of the tobacco sold by plaintiff, as stated in paragraph 7, above, the sum of $607.08, with which it purchased United States documentary stamps, known as "Tobacco Sales Tax Stamps," and affixed said stamps to the memoranda of sale of said tobacco to evidence the payment of the tax upon the sale thereof, and canceled said stamps; said tax having been levied pursuant to the provisions of said act and in accordance with the regulations of the Commissioner of Internal Revenue. Said warehouse company also deducted its warehouse charges from the sale price of the tobacco and paid the balance to plaintiff.

10. The tobacco sold by plaintiff on December 18, 1934, as aforesaid, was all sold to the purchasers and in the amounts and for prices as follows:

| Purchaser | Amount | Price |
|---|---|---|
| American Tobacco Company of Durham, North Carolina | 2918 | $ 689.88 |
| R. J. Reynolds Tobacco Company, Winston-Salem, North Carolina | 1458 | 344.25 |
| Southwestern Tobacco Company | 1870 | 233.72 |
| Liggett & Myers Tobacco Company, New York City | 1532 | 171.70 |
| Vaughn Tobacco Company, Lexington, Kentucky | 410 | 20.95 |
| Kentucky Burley Tobacco Company, Lexington, Kentucky | 232 | 12.18 |
| Geary-Wright Warehouse, Lexington, Kentucky | 2186 | 380.55 |
| | 10606 | $1853.23 |

11. The tobacco sold by plaintiff on January 2, 1935, as aforesaid, was all sold to the purchasers and in the amounts and for prices as follows:

| Purchaser | Amount | Price |
|---|---|---|
| R. J. Reynolds Tobacco Company, Winston-Salem, North Carolina | 1432 | $336.01 |
| Southwestern Tobacco Company | 590 | 69.67 |
| Liggett-Myers Tobacco Company, New York City | 740 | 101.20 |
| Vaughn Tobacco Company, Lexington, Kentucky | 136 | 10.88 |
| Geary-Wright Warehouse, Lexington, Kentucky | 548 | 57.39 |
| | 3446 | $575.15 |

12. Immediately after sale, said tobacco was redried by the purchasers and packed into hogsheads with other tobacco and its identity lost. Said redrying and packing took from 24 to 36 hours subsequent to the purchase of the tobacco. Said tobacco was moved immediately thereafter to storage warehouses within and without the state of Kentucky. A substantial portion of said tobacco was thus moved to storage warehouses outside the state of Kentucky and a substantial portion thereof to warehouses within the state of Kentucky. Approximately 85 per cent. of the tobacco purchased from plaintiff on December 18, 1934, and January 2, 1935, was thus moved outside the state immediately after redrying, or has been, or will be, so moved within 24 months after the date of purchase as it is withdrawn from storage in Kentucky, as required by the purchasers thereof in the manufacture of tobacco products.

13. Seed beds for Burley tobacco are prepared in Kentucky about March 1st, and the seeds are sown therein about that time; and the plants produced in these beds are transplanted and set out in the fields between May 20th and July 1st, although practically all such transplanting usually takes place in Kentucky between June 1st and June 20th. The tobacco is usually harvested during the months of August and September by cutting the stalks, placing them on sticks, and hanging them in barns or sheds, where it is air-cured. The air-curing usually requires six to eight weeks. Thereafter, the leaves are stripped from the stalks, graded and tied in bundles or hands, and then transported to tobacco auction warehouses, where the tobacco is sold at auction for the producer.

The auction season for Burley tobacco sales opens December 1st and continues until all, or substantially all, the crop has been sold, which is usually about March 1st. At the auction sale the tobacco is purchased chiefly by manufacturers or their agents, and also by dealers, commission merchants, and speculators. After such sales are held, substantially all of such tobacco is redried and packed into hogsheads in Kentucky and the identity of particular lots is lost. The tobacco moves through the redrying machine in about one and one-half hours. The operation of redrying and packing is usually completed within about four days after the date of purchase. After the redrying the tobacco is immediately packed into hogsheads and moved to storage warehouses and stored therein. Some of the warehouses used for storing such tobacco are located in Kentucky and some of such warehouses are located in other states. The principal storage warehouses of manufacturers of Burley tobacco are located in the states wherein their manufacturing plants are located, but said manufacturers also have intermediate storage warehouses in Kentucky. A substantial portion of each crop immediately after being packed in hogsheads is transported to warehouses located in states other than Kentucky, and also a substantial portion of each crop is immediately transported, after the redrying and packing in hogsheads, to storage warehouses in Kentucky. All of the tobacco so stored in warehouses in Kentucky is withdrawn from storage at various intervals of time subsequent to such storage and up to approximately 24 months after the date of its storage, and, where manufactured in states other than Kentucky, the tobacco as withdrawn from storage is transported to the warehouses of such manufacturers in the states where the manufacturing is done and withdrawn from such warehouses as needed by the manufacturers.

14. On or about November 1, 1934, Henry A. Wallace, Secretary of Agriculture, pursuant to the terms of the act, prepared and caused to be transmitted to persons who owned, rented, controlled, or share-cropped land customarily engaged in the production of tobacco, ballots with respect to the question of whether such persons favor a tax on the sale of tobacco of the type produced by such persons, for the crop year beginning May 1, 1935, as provided in the act.

Thereafter, the votes cast on such ballots were tabulated with respect to each type of tobacco by the county agent in each county in which such votes were cast, and the tabulation of such votes transmitted by such county agents to the Secretary of Agriculture. Upon receipt of such reports from said county agents, the Secretary of Agriculture caused the total of the votes with respect to each type of tobacco to be tabulated. Out of a total 131,322 votes cast by growers of Burley tobacco, 120,265 voted "yes"; 11,057 voted "no." The total number of votes cast by all growers of all tobaccos was 378,462, of which 354,688 voted "yes," and 23,774 voted "no." Of a total of 1,000,877 acres of land customarily engaged in the production of tobacco, growers representing 91.9 per cent. of this land

voted, and 88.6 per cent. voted in favor of this tax. This was 96.4 per cent. of the total land actually voted. Persons representing 90.3 per cent. of the land customarily engaged in the production of Burley tobacco voted, and 86.4 per cent. voted in favor of the tax. This percentage is 95.7 per cent. of the land actually voted.

15. On February 24, 1935, Henry A. Wallace, Secretary of Agriculture, proclaimed and determined that the persons who owned, rented, share-cropped, or controlled three-fourths of the land customarily engaged in the production of Burley tobacco, favored the levy of the tax thereon; that the imposition of the tax thereon was necessary for the orderly marketing of such tobacco in interstate and foreign commerce, and to effectuate the declared policy of the act.

On or about February 28, 1935, Henry A. Wallace, Secretary of Agriculture, pursuant to the terms of the act, after considering the basic economic data pertaining to the economic situation relative to tobacco production and marketing, determined and proclaimed that the declared policy of the act would be best effectuated by the levy of the tax provided for therein for the period commencing May 1, 1935, and ending June 30, 1935, both inclusive, at a rate of 25 per cent. of the price for which tobacco, with respect to which the tax is applicable, is sold.

16. The number of tax-payment warrants issued for the 1934 crop and the sales by contracting and noncontracting producers and the total sales from the 1934 crop of types to which the Kerr Tobacco Act was applicable, and the amount of taxes collected on sales of the 1934 crop, were as stated in Plaintiff's and Defendant's Joint Exhibit 31.

17. The acreage planted to Burley tobacco, the yield per acre thereon, the price thereof, the annual production thereof, the stocks thereof on hand at the beginning of each year, the yearly supply thereof (being stocks on hand at the beginning of each year plus production in such year), the annual disappearance, exports, and domestic consumption thereof for the crop years 1919–20 to 1935–36, both inclusive, were as stated in Joint Exhibit 32. The average price per pound for Burley tobacco for the years 1931–32 was 8.7 cents; years 1932–33, 12.5 cents; years 1934–35, 16.9 cents; years 1935–36, 19.0 cents.

18. The annual production, unit prices, and farm value in Kentucky and in the United States of Burley tobacco for each calendar year from 1919 to 1935, both inclusive, and (b) the aggregate production, unit price, and farm value of tobacco of all types grown in the United States for the calendar years 1919 to 1935, both inclusive, were as stated in Joint Exhibit 33.

19. The amounts of specified types of tobacco sold by growers within the United States which are (a) exported and (b) retained for domestic consumption or future export for each crop year from 1929–30 to and including 1933–34, were as stated in Joint Exhibit 34.

20. The average production, quantity manufactured, net movement from specified states of leaf tobacco for the five years from 1929 to and including 1933 are as follows:

| State | Production as shown by estimates of Department of Agriculture 1/ (1) | Quantity reported as used in manufacture within respective states 2/ (2) | Difference between quantity produced and quantity manufactured (column (1) minus column (2)) (3) |
|---|---|---|---|
| | 1,000 pounds | 1,000 pounds | 1,000 pounds |
| Georgia | 64,900 | 474 | 64,426 |
| Kentucky | 374,500 | 46,730 | 327,770 |
| North Carolina | 477,515 | 341,834 | 135,681 |
| South Carolina | 76,694 | 2,662 | 74,032 |
| Tennessee | 122,722 | 24,244 | 98,478 |
| Totals | 1,116,331 | 415,944 | 700,387 |

The average production, quantity manufactured, and total movement from specified states of leaf tobacco for the five years from 1929 to and including 1933 are as follows: rettes, manufactured tobacco, and snuff, in each state manufacturing such products, for each year from 1929 to and including 1934, were as stated in Joint Exhibits 41, 41a, 41b, 41c, 41d, and 41e, respectively.

| State | Production as shown by estimates of Department of Agriculture 1/ (1) | Quantity Reported as used in manufacture within respective states (2) | Quantity reported as exported by dealers and manufacturers (3) | Difference between total of quantity manufactured and exported and quantity produced. (Col. 2 plus Col. 3 minus Col. 1) (4) |
|---|---|---|---|---|
| | 1,000 pounds | 1,000 pounds | 1,000 pounds | 1,000 pounds |
| Illinois | 0 | 21,347 | 3 | 21,350 |
| New Jersey | 0 | 41,385 | 1,025 | 42,410 |
| New York | 1,061 | 23,579 | 45,589 | 68,107 |
| Virginia | 97,590 | 122,190 | 316,870 | 341,470 |
| West Virginia | 4,298 | 12,563 | 0 | 8,265 |
| Totals | 102,949 | 221,084 | 363,487 | 481,602 |

21. With respect to each type of tobacco, the value of sales made by growers and the amount of benefit payments for the crop years 1929–30 to 1935–36, both inclusive, were as stated in Joint Exhibit 36.

22. Benefit payments by states and by crops, made with respect to basic agricultural commodities under the Agricultural Adjustment Act to January 31, 1935, were as stated in Joint Exhibit 37.

23. The exports of unmanufactured tobacco by types, and the value of such exports for the calendar years 1923 to 1935, both inclusive, were as stated in Joint Exhibit 38.

24. With respect to wheat, cotton, and tobacco grown in the United States, the acreage harvested, the total production, exports, stocks on hand at the beginning of the period, and the average farm prices for certain selected periods indicated therein were as stated in Joint Exhibit 39.

25. The amount of tobacco entering into the manufacture of various tobacco products for each calendar year from 1919 to and including 1934 was as stated in Joint Exhibit 40.

26. The quantities of leaf tobacco, all types, used in manufacturing cigars, ciga-

27. The estimated annual production by types of tobacco in the state of Kentucky for the years 1930–1935, both inclusive, was as stated in Joint Exhibit 42.

28. The actual and parity prices of flue-cured, Burley, fire-cured, and dark air-cured tobacco for the years 1919–1935, inclusive, were as stated in Joint Exhibit 43. In each case the parity price of a commodity is its fair exchange value as the term "fair exchange value" is defined in the Agricultural Adjustment Act.

29. The total number, base acreage, and base production of tobacco production adjustment contracts in effect during the crop years 1934 and 1935 were as stated in detail in Joint Exhibit 44.

30. The total taxes collected by the Bureau of Internal Revenue, Treasury Department of the United States, under the act, with respect to each type of tobacco for the period ending February 23, 1935, and number of pounds of tobacco with respect to which such tax was paid, were as stated in Joint Exhibit 45.

31. The total tax collections under the Kerr-Smith Act by months to and including January, 1936, were as stated in Joint Exhibit 46.

32. The cash farm income from all farm products and from production of tobacco, in Kentucky, 1924–1935, was as stated in Joint Exhibit 47.

33. As a result of the higher prices for tobacco in the 1934 crop year, growers of Burley tobacco who had not entered into production adjustment contracts increased their acreage planted to tobacco in 1935. 2,297 growers of Burley, in 57 counties, grew 1,655.1 acres of Burley in 1934, 2,-237.3 acres of Burley in 1935, as accurately stated in detail in Joint Exhibit 48. The increase in production by these growers in the 57 counties, so stated, is truly representative of a similar increase in all the Burley growing areas of the United States.

34. The surplus stocks, consumption and price outlook, disappearance, consumption, exports, returns to farmers, manufacturer's profits, farming income and expenditures, the exchange of value of farm products, gap between farm and non-farm prices, and the debt and tax burdens of farmers for the various years as stated in Joint Exhibits 50 to 57, were as stated in said exhibits.

35. The foreclosure of farms in the state of Kentucky, the bankruptcies among farmers and others in Kentucky, land values in Kentucky, debits of banks located in Kentucky, and purchasers of selected products by residents of Kentucky for each of the years from 1929 to 1934, inclusive, were as stated in Joint Exhibit 58.

36. The amount of tax-payment warrants in pounds of tobacco issued under the act to producers of Burley tobacco residing in Fayette county, Ky., up to February 23, 1935, and the number of benefit contracts signed subsequent to June 28, 1934, by certain producers of tobacco, were as stated in Joint Exhibit 59.

37. The states in which cigarettes are manufactured and the number of cigarettes manufactured in the several states for the years 1930 to 1934, inclusive, were as stated in Joint Exhibit 63.

38. The amounts of Burley produced by specified states, between October 1, 1933, and September 30, 1934; the percentage which the production of each state is of the total; the amounts of Burley processed in specified states between said dates; and the percentage which the tobacco processed by each state is of the total—are as follows:

| State | 3-yr. Ave. production 1931-33 1/ | Percentage distribution of production | Amount Processed in state 2/ | Percentage distribution of processed tobacco | Excess production over processed tobacco |
|---|---|---|---|---|---|
| | 1,000 pounds | Percent | 1,000 pounds | Percent | 1,000 pounds |
| U. S. Total | 376,352 | 100.00 | 268,200 | 100.000 | 108,152 |
| Indiana | 10,706 | 2.84 | 8 | .003 | 10,698 |
| Kentucky | 263,043 | 69.89 | 32,581 | 12.148 | 230,462 |
| Missouri | 7,187 | 1.91 | 26,957 | 10.051 | –19,770 |
| North Carolina | 5,680 | 1.51 | 119,697 | 44.630 | –114,017 |
| Ohio | 14,809 | 3.93 | 12,112 | 4.516 | 2,697 |
| Tennessee | 60,875 | 16.18 | 113 | .042 | 60,762 |
| Virginia | 9,807 | 2.61 | 48,367 | 18.034 | –38,560 |
| West Virginia | 4,024 | 1.07 | 151 | .056 | 3,873 |
| California | 0 | 0 | 2,011 | .750 | – 2,011 |
| New York | 0 | 0 | 381 | .142 | – 381 |
| All Other | 0 | 0 | 25,822 | 9.628 | –25,822 |

39. The factors affecting acreage planted to Burley; the price and purchasing power of crops of Burley; the production, relationship of supplies, and disappearance to price; and the relationship of the production adjustment program to prices of Burley in specified years, were as stated in Joint Exhibits 65 to 70, inclusive.

40. The production for the year 1933 by growers who did not sign crop adjustment programs, the possible production by such growers in 1935 if no tax had been levied under the Kerr-Smith Act, the increase from 1933 to 1935 in the production by such growers, and the amount by which 1935 production by contracting producers was less than base production, are estimated by the Department of Agriculture as follows:

supplies during 1935–36 without such a tax, as found by the United States Department of Agriculture from statistics of the department, are as stated in Joint Exhibit 72.

42. The estimates of sales, price and value with and without the production adjustment program and the Kerr-Smith Act for the years 1933–1935, inclusive, made by the Department of Agriculture, are as stated in Joint Exhibit 73.

43. The relationship between total farm income from tobacco and bank suspensions for the years 1922 to 1932, inclusive, and the relationship between such income and new motorcar registration for the years from 1928–29 to 1933–34, inclusive, were as shown in Joint Exhibits 74 and 75, respectively.

| Kind of Tobacco | Estimated 1933 production of growers who did not sign production adjustment contracts | Estimated 1935 production of growers who did not sign production adjustment contracts if tax were not levied under Kerr-Smith Act | Estimated increase from 1933 to 1935 in production of noncontracting producers | Estimated amount by which 1935 production of contracting producers is less than base production. |
|---|---|---|---|---|
| | Million pounds | Million pounds | Million pounds | Million pounds |
| Flue-cured | 20 | 76 | 55 | 91 |
| Fire-cured | 18 | 47 | 29 | 23 |
| Burley | 39 | 110 | 71 | 131 |
| Dark Air-cured | 12 | 35 | 23 | 7 |
| Cigar filler and binder | 15 | 32 | 17 | 77 |
| Total | 104 | 299 | 195 | 329 |

41. The estimated 1934–35 disappearance, the production in 1934, the amount removed from supplies during the crop year 1934–35; the total base production under contract, percentage reduction required in 1935 under contract and the estimated 1935 production under contract; the 1935 productions by noncontracting producers estimated with and estimated without the tax under the Kerr-Smith Act and the 1935 crop estimated with and estimated without such tax; the estimated 1935–36 disappearance; the estimated change in supplies during 1935–36 with the tax under the Kerr-Smith Act and the estimated change in

44. For several years immediately preceding the enactment of the Kerr-Smith Act, the amount of tobacco produced in the United States was greatly in excess of the amount consumed, and as a result very large surplus stocks of tobacco were accumulated from year to year. Production of tobacco greatly in excess of consumptive demand forced down the grower's price of tobacco to a very low level, in many cases below the cost of production of such tobacco.

45. A very great percentage of the tobacco produced in the United States, after being sold by the farmer and redried, moves in interstate and foreign commerce, both

prior to its manufacture into tobacco products and subsequent thereto. More than 85 per cent. of the Burley tobacco produced in Kentucky moves in interstate commerce after being sold by the farmer and redried, and prior to manufacture into tobacco products.

Upon the foregoing special findings of fact, which are made a part of the judgment herein, the court makes, declares, and enters the following:

### Conclusions of Law.

1. Under 28 U.S.C.A. c. 2, § 41 (5), (R. S. § 563, par. 5; section 629, par. 4; March 3, 1911, c. 231, § 24, par. 5, 36 Stat. 1092), the court has jurisdiction of this action regardless of the amount involved.

2. The Kerr-Smith Tobacco Act (48 Stat. 1275, see 7 U.S.C.A. c. 28, §§ 751–766) is an act regulating agricultural production, a subject on which the Congress lacks power to legislate, and tax levied thereunder is a mere incident thereto and is not a proper exercise of the taxing power of Congress as authorized under the Federal Constitution.

The act is not a constitutional exercise of the power of the Congress to regulate interstate and foreign commerce.

3. The act of the Congress and the regulations of the Secretary of Agriculture, under which the plaintiff was required to pay the taxes sought to be recovered in this action, are void and of no effect.

4. The sum sought to be recovered in this action by the plaintiff was unlawfully collected by the defendant, and he is entitled to recover same, together with interest and cost.

### Judgment.

It is hereby ordered, adjudged, and decreed that the plaintiff have judgment against the defendant in the sum of $607.-08, together with 6 per cent. interest on $463.30 of said sum from December 18, 1934, until thirty days before date of payment, and 6 per cent. interest on $143.78 of said sum from January 2, 1935, until thirty days before date of payment, and his costs in this action expended.

It appearing to the court that the above sums were collected by the defendant from the plaintiff at the direction and order of the Commissioner of Internal Revenue, it is adjudged that there was probable cause for the collection thereof by the defendant from the plaintiff. It is therefore adjudged that no execution issue against the defendant for any part of this judgment. It is adjudged that same is a claim against the United States of America and shall be paid in the form and manner as provided by law.

The motions of plaintiff and defendant for findings of fact and conclusions of law, in so far as each of them is in conflict with the facts here found and conclusions of law stated, are hereby overruled, and the objections of plaintiff and defendant to the facts as found by the court and conclusions of law as stated are overruled, to which rulings of the court exceptions are allowed to both plaintiff and defendant.

### Memorandum.

Plaintiff, a grower of Burley tobacco in Fayette county, Ky., seeks to recover from the defendant, collector of internal revenue for the District of Kentucky, $607.08, together with lawful interest thereon, taxes paid by him under the Kerr-Smith Tobacco Act (48 Stat. 1275, see 7 U.S.C.A., c. 28, §§ 751–766).

The facts have been stipulated, and if the act involved is a valid exercise of congressional power, this action should be dismissed. If the act under which the taxes were collected is unconstitutional, the plaintiff is entitled to recover.

The defendant contends this court is without jurisdiction because the amount sought to be recovered is less than $3,000. This contention is without merit. 28 U.S.C.A. c. 2, § 41 (5), R.S. § 563, par. 5; section 629, par. 4; March 3, 1911, c. 231, § 24, par. 5, 36 Stat. 1092; Accardo v. Fontenot (D.C.) 269 F. 447, affirmed (C.C.A.) 278 F. 871.

The United States Supreme Court, in the cases of United States v. Butler, 297 U. S. 1, 88, 56 S.Ct. 312, 80 L.Ed. ——, 102 A. L.R. 914; Rickert Rice Mills, Inc. v. Fontenot, 297 U.S. 110, 113, 56 S.Ct. 374, 80 L. Ed. ——, disposed of all contentions in the case at bar, and based on these opinions, the tax collected by the defendant from the plaintiff was under a void and unconstitutional law. Plaintiff is entitled to recover.

Findings of fact and conclusions of law have been found and stated as requested by the parties to this action.