## ROBERTSON v. TAYLOR.

### No. 4148.

Circuit Court of Appeals, Fourth Circuit.

June 14, 1937.

Fred E. Youngman, Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., Sewall Key, Sp. Asst. to Atty. Gen., Carlisle W. Higgins, U. S. Atty. of Greensboro, N. C., and A. M. Wilding-White, Atty., Department of Agriculture, of Washington, D. C., on the brief), for appellant.

E. M. Whitman, of Winston-Salem, N. C., and Robert H. McNeill, of Washington, D. C. (George H. McNeill, of Washington, D. C., J. F. Motsinger, of Winston-Salem, N. C., and Kelly Kash, of Washington, D. C., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal from a judgment for plaintiff in an action instituted against a collector of internal revenue to recover the sum of $314.32, taxes collected pursuant to the Kerr-Smith Tobacco Act, 48 Stat. 1275, amended 49 Stat. 778. The only question in the case is as to the constitutionality of the statute, since the sale of tobacco and the collection of the amount stated pursuant to its provisions are admitted. It has been held unconstitutional by Judge Dawson in Penn v. Glenn (D.C.) 10 F.Supp. 483 and by Judge Hamilton in Smith v. Glenn (D.C.) 16 F.Supp. 83, as well as by the court below

in the decision appealed from (16 F.Supp. 801).

The statute in question, which was repealed by Congress February 10, 1936 (49 Stat. 1106), shortly after the decision of the Supreme Court of the United States in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 328, 80 L.Ed. 477, 102 A.L.R. 914, holding the Agricultural Adjustment Act (7 U.S.C.A. § 601 et seq.) unconstitutional, was intended to supplement the provisions of that act. Counsel for the collector, in their brief, thus comment upon its history: "At the time when the Kerr-Smith Tobacco Act was enacted, the Agricultural Adjustment Act had been in effect for well over one year and the tobacco program for almost nine months. The tobacco to be harvested during 1934 and sold in December 1934 and January 1935 had been planted and practically all transplanted on the effective date of the act. Two classes of producers had definitely come into existence—the one with an acreage and production already limited, the other with no limits and able in the absence of the additional cost burden of the tax to market tobacco in large quantities and at low prices capable of ruining the price of tobacco. It was to remedy this situation existing in fact that the Tobacco Act was passed." And they quote the following as to its purpose from a statement by the Chief of the Tobacco Section of the Department of Agriculture, viz.: "As we understand it, the two primary purposes of the Tobacco Act are to discourage the production of tobacco by those who have not shared in the production adjustment program and to equalize, insofar as possible, as between contracting producers and non-contracting growers, the advantages of the higher prices resulting from the adjustment program. We bore these purposes constantly in mind in working out the plans for the administration of the Act."

The act is entitled, "An Act To place the tobacco-growing industry on a sound financial and economic basis, to prevent unfair competition and practices in the production and marketing of tobacco entering into the channels of interstate and foreign commerce, and for other purposes." Its declared policy is set forth in section 2 to be: "to promote the orderly marketing of tobacco in interstate and foreign commerce, to enable producers of tobacco to stabilize their markets against undue and excessive fluctuations, to prevent unfair competition and practices in putting tobacco into the channels of interstate and foreign commerce, and to more effectively balance production and consumption of tobacco, and to relieve the present emergency with respect to tobacco." 48 Stat. 1276.

To carry out this policy, the act imposes a tax of 33⅓ per cent. of the sale price upon the sale of tobacco, with provision, however, that the Secretary of Agriculture may reduce the tax to as low a rate as 25 per cent. upon his determining that the declared policy of the act will be best effectuated by so doing. The tax is made applicable, with certain exceptions not here material, to all tobacco harvested in the crop year 1934-1935. "Thereafter whenever the Secretary of Agriculture determines that the persons who own, rent, share crop, or control three fourths of the land customarily engaged in the production of any particular type of tobacco favor the levy of the tax thereon and that the imposition of the tax thereon is necessary for the orderly marketing of such tobacco in interstate and foreign commerce and to effectuate the declared policy of this Act, he shall proclaim such determination at least sixty days prior to the next succeeding crop year, and the tax shall thereafter apply to tobacco of such type harvested during the crop year next following the date of such proclamation." Section 3(b), 48 Stat. 1276.

The tax imposed by the act, however, is not to be paid by all persons and at all events. Section 5(a), 48 Stat. 1277, authorizes the Secretary of Agriculture to issue tax payment warrants to persons who shall have entered into contracts with him for the reduction of acreage pursuant to the Agricultural Adjustment Act, covering the number of pounds of tobacco which they are entitled to market under such contracts. And this, of course, means that no tax is in fact imposed upon sales of tobacco made by producers who have entered into contracts with the Secretary of Agriculture, where such sales are within the limits allowed by these contracts. The tax is to be in fact collected only with respect to sales made by producers who fail or refuse to enter into contracts with the Secretary or who market tobacco in excess of the limits allowed by such contracts. That its purpose is not the raising of revenue, but the regulation of the production and marketing of tobacco is emphasized by section 5(b), which authorizes the Secretary in his discretion to issue further tax payment warrants to persons to whom he may determine that "no equitable allotment of tobacco acreage or produc-

tion is possible under tobacco-reduction contracts offered pursuant to the Agricultural Adjustment Act."

The collector does not argue that the statute is valid under the commerce clause of the Constitution, but attempts to sustain it as a valid exercise of the taxing power. It is clear, however, that as an exercise of this power it falls squarely within the condemnation of United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 328, 80 L.Ed. 477, 102 A.L.R. 914. The tax is imposed not as a means of raising revenue, but as a mere step in a plan for the regulation of agriculture. It goes beyond the taxing statute condemned by the Supreme Court in the Butler Case in that the tax is not imposed generally on sales of tobacco, but applies, in practical effect, only to those who fail to comply with the plan of regulation adopted by the Secretary of Agriculture under the Agricultural Adjustment Act. Such a statute is invalid even under the views expressed in the dissenting opinion in that case, wherein it is said: "The power to tax and spend is not without constitutional restraints. One restriction is that the purpose must be truly national. Another is that it may not be used to coerce action left to state control." A statute taxing sales not made in accordance with the plan adopted by the Secretary of Agriculture for the control of the production and marketing of tobacco is certainly a use of the taxing power to coerce action with respect to matters "left to state control."

The judgment appealed from will be affirmed.

Affirmed.