**UNITED STATES v. GOLDSMITH FRUIT CO.**

District Court, S. D. Florida.

Feb. 25, 1937.

John S. L. Yost, Sp. Asst. to Atty. Gen., G. Osmond Hyde, Atty. Dept. of Agriculture, of Downey, Idaho, Herbert S. Phillips, U. S. Dist. Atty., of Tampa, Fla., and Lloyd C. Hooks, Asst. U. S. Dist. Atty., of Miami, Fla., for the United States.

Alto Adams, of Fort Pierce, Fla., and Thomas B. Adams, of Jacksonville, Fla., for defendant.

HOLLAND, District Judge.

The suit involves the validity of the order provisions of the Agriculture Adjustment Act, approved May 12, 1933, as amended on August 24, 1935 (7 U.S.C.A. § 601 et seq.), the validity of Order No. 7, which is an order regulating the handling of citrus fruit grown in the State of Florida, and which was issued by the Secretary of Agriculture of the United States pursuant to section 8c of title I of said act, as added by Act Aug. 24, 1935, § 5 (7 U.S.C.A. § 608c). The defendant is a handler of citrus fruit, and it is alleged by the sworn bill of complaint that said defendant, in violation of the provisions of the order, and in the regular course of its business in handling, selling, and shipping grape fruit, did ship during the effective period of each of the weekly pro rata regulations from points in the State of Florida to points in other states of the United States large quantities of grape fruit in fresh form grown in the State of Florida in excess of the allotments made to the defendant by the Secretary of Agriculture, and in excess of the quantity entitled to be shipped by the defendant pursuant to the allotments made to the defendant as increased by the permissible overshipments. The shipments thus made by the defendant are set forth in the bill of complaint.

An answer to the bill of complaint, duly verified, was filed in which was incorporated a motion to dismiss the bill of complaint because the same is bad in substance; there being assigned seven grounds for said motion. Affidavits in support of the bill and of the answer were filed at a hearing held before me at Fort Pierce, Fla., on the 12th day of February, 1937, and oral testimony in support of the bill and in support of the answer was heard on this application for temporary injunction. Argument on the motion continued over to the next day, February 13, 1937, and the matter was taken under advisement.

Very comprehensive briefs have been submitted. The brief for the defendant embraces ten points, most of which points are singly and collectively submitted in line with the motion to dismiss the bill incorporated in the answer.

By section 8c (1), 7 U.S.C.A. § 608c (1), the authority to the Secretary of Agriculture to issue the order is granted. By section 8c (2), 7 U.S.C.A. § 608c (2), fruits are made an applicable commodity. By section 8c (3) (4), 7 U.S.C.A. § 608c (3, 4), provision is made for notice and hearing and the findings by the Secretary, and the issuance of the order. By section 8c (6) (7), 7 U.S.C.A. § 608c (6, 7), specific provision is made of a mandatory and permissive nature as to the terms of said order. The order in this case embraces provisions complying with section 8c (6) (A, C, and E), 7 U.S.C.A. § 608c (6) (A, C, E), and section 8c (7) (C and D), 7 U.S.C.A. § 608c (7) (C, D).

The order of the Secretary as authorized (unless it is accomplished by the approval of the President, as provided for in section 8c (9), 7 U.S.C.A. § 608c (9), is dependent upon the prerequisite that "not less than 50 per centum of the volume of the commodity or product thereof covered by such order which is produced or marketed within the production or marketing area defined in such order have signed a marketing agreement." 7 U.S.C.A. § 608c (8). And further it is provided that said marketing agreement must have been entered into pursuant to section 8b (7 U.S.C.A. § 608b).

And further it is provided that before finally authorizing and making said order the Secretary must determine that the issuance of such order is approved and favored by two-thirds of the producers, or two-thirds of the volume produced of such commodity, as specified in either section 8c (8) (A or B), 7 U.S.C.A. § 608c (8) (A or B), and further that there is compliance with subdivision 10 (7 U.S.C.A. § 608c (10) as to the manner of regulation and applicability.

There was filed in this case in addition to the motion to dismiss the bill of complaint a separate instrument styled "motion to dissolve temporary restraining order." The subject-matter of this last-mentioned motion is the subject-matter of point 1 of defendant's brief. I am of the opinion that the statute involved is not of such doubtful validity as contended by

the defendant, and that this motion should be overruled.

Point 2 of the defendant's brief attacks the constitutionality of the act generally, and my conclusions sustaining the validity of the said act are dealt with when other points in defendant's brief are considered more in detail.

Point No. 3 is as follows: "It appears from the face of the bill and from the evidence that an agreement by not less than fifty per cent. (50%) of handlers, as required by section 8c (6), was not obtained, and in consequence the Secretary of Agriculture, never acquired any jurisdiction or power to issue handling Order No. 7."

This is an attack upon the jurisdiction or power of the Secretary to issue the handling order No. 7, it being alleged that the condition precedent to the issuance of the order had not been complied with. The bill of complaint alleges compliance with this condition precedent, but the answer attacks the genuineness and binding effect of the voluntary marketing agreement. On this application for temporary injunction I am taking the bill at its face value with reference to the genuineness of the signatures to the marketing agreement.

Point No. 4 attacks the legal sufficiency and validity of the order, while point No. 3 makes the same attack from a factual standpoint. I am of the opinion that neither attack is good. As stated, on the factual standpoint, I have considered the marketing agreement from its face value, and as having been genuinely executed by not less than 50 per cent. of the handlers as set forth in the bill of complaint; and as to the legal sufficiency and validity, I am of the opinion that this attack is not well taken.

It is contended that the marketing agreement was executed on the one part by the Secretary of Agriculture and, as parties of the second part, by shippers who during the shipping season of 1934–1935 handled more than 50 per cent. of the volume of fruit handled in that season. The contention of the defendant is that the order in question is made binding on handlers of the 1936–1937 crop, when the personnel in this class is not necessarily the same as the handlers of the previous season, when the prerequisite voluntary marketing agreement was executed. Compliance with section 8 (c). (8), 7 U.S.C.A. § 608c (9), is a condition precedent to the effectiveness of the order. A marketing order of the Secretary (not authorized by the President) is authorized, and there are necessary elements to be incorporated therein outlining the policy and yard stick measure which are set out in specific sections of the act, but before such order becomes effective it is provided that a marketing agreement of a voluntary nature must exist, and be of a proper nature. The marketing agreement provided by section 8b (7 U.S.C.A. § 608b) required no specific number of handlers to make it effective and binding upon those who did sign such an agreement. But this condition precedent to the effectiveness of the order by the Secretary requires that such marketing agreement shall have been signed by not less than 50 per cent of the volume of the commodity or product thereof covered by such order, which is produced or marketed within the production or marketing area defined in such order.

The consent of the defendant is not necessary to the validity of the order. The approval of the President could have made it involuntarily effective. But without the President's approval, it was necessary for there to have been in existence a voluntary marketing agreement, which was a matter of agreement between the Secretary and agreeing handlers, such agreement consisting of two parties, one the Secretary and one the handlers collectively, and the terms of this voluntary agreement must have been approved by not less than 50 per cent. of the volume of such fruit as of the time of the execution of the said agreement, and the final order must embrace and include the terms of this voluntary agreement. Consent is involved in this voluntary agreement, but consent of the handler is not necessary to the validity of an order issued by the Secretary. As a limiting feature on the authority of the Secretary, the provision is made as to the consent of 50 per cent. of the volume, which must have been theretofore obtained by voluntary agreement. Counsel for the defendant puts stress upon the necessity of this voluntary agreement being signed by 50 per cent. of the volume of the current season, and that the act is faulty in not specifically providing that this 50 per cent. of volume shall be measured by the particular season when the marketing agreement was in fact executed. With this contention I cannot agree, as I am of the

opinion that there is read into the act the fact that 50 per cent. of the volume relates to 50 per cent. of the volume of the fruit at the time the agreement was executed.

The defendant contends that those handlers who have entered into a voluntary agreement with the Secretary have legislated upon the subject-matter because the order of the Secretary must conform to the provisions of the voluntary agreement. With this I cannot agree. The Secretary has made the order according to a well-defined policy set forth in the act itself, which includes terms and conditions prescribed by the act. The existence of a voluntary agreement is a condition precedent or limitation upon the right of the Secretary to issue the order. The handlers who did sign the agreement with the Secretary did not legislate. There may have been few, or there may have been many, who under the act could enter into the agreement with the Secretary. Their agreement did not constitute legislation. It was a result of the meeting of the minds of contracting parties. This condition precedent to the validity of the order prescribes that the voluntary agreement must have extended to not less than 50 per cent. of the production of the commodity at the time the agreement was executed. I cannot agree with the contention made by defendant to the effect that by incorporating the provisions of the voluntary agreement in the order itself, which with the compliance with the other provisions of the act, would become mandatory upon all the handlers, that such voluntary agreement constituted legislation inflicted unwillingly upon handlers who never have agreed either to a voluntary agreement, or to the order itself. Compliance with this condition precedent was for the purpose of insuring the reasonableness of all the terms of the order, and insured incorporation of the terms of the voluntary agreement, which was as pointed out not unilateral but contractual.

Point No. 5 questions validity on the ground of their having been an unwarranted delegation of legislative authority. The declaration of policy set out in section 2 of the act (7 U.S.C.A. § 602) need not be elaborated upon. The goal sought is definitely stated. Conditions and restrictions upon the validity of the order are prescribed in various sections, but the attack made by this point No. 5 is whether the yard stick or measure of definite lim-its within which the Secretary may issue an order to accomplish the goal and end is set forth in section 2 of the act. Section 8c (6) (7), 7 U.S.C.A. § 608c (6, 7), prescribe terms of the order in sufficient language to resist this attack as being an unwarranted delegation of legislative authority. I am of the opinion that the handlers who entered into the voluntary agreement with the Secretary did not legislate and bind handlers otherwise bound by the force of the order itself, and I am further of the opinion that the legislation of the Secretary as contained in the order under attack is the proper exercise of regulations of the citrus industry under prescribed terms and limitations set forth in the act itself.

Point No. 6 in defendant's brief relates to an attack upon the order as invading the province of the States, and being in contravention of the Tenth Amendment of the Federal Constitution. I am of the opinion that this order is not a regulation of agriculture. It is a regulation of the activities of handlers engaged in interstate and foreign commerce.

Congress by this act has dealt with the handling of fruit, in interstate and foreign commerce, a legitimate and legal business, and has declared that without regulation the transaction of same under existing economic conditions constitutes a burden and oppression directly affecting such commerce. National emergency alone does not justify this legislation. Public welfare alone does not justify the legislation. It is true that the act does not regulate production, but does regulate commerce in its broader sense. The question presented is does such commerce in fruit under existing conditions constitute an oppressive burden upon and directly affecting such commerce. There must be some authority in the Constitution for Congress to regulate interstate commerce in fruit. Congress has by this act declared that there was a disparity in purchasing power, and that the seriousness of the same was a contributing factor of an economic depression of national scope. I am of the opinion that unrestricted and unregulated traffic in interstate commerce in an otherwise perfectly valid business can under certain conditions directly affect and constitute a burden on such commerce. Congress has so declared by this act. Having so declared, and with reason, the legislation has constitutional authority under the com-

merce clause (article 1, § 8, cl. 3). The cases authorizing legislation based on the commerce clause are set out in the recent case of Kentucky Whip & Collar Co. v. Ill. Central R. R. Co., 57 S.Ct. 277, 81 L.Ed. 270, decided by the Supreme Court of the United States on January 4, 1937. I realize that this legislation under question does not come within the reasoning of the cases upholding acts of Congress absolutely prohibiting certain merchandise or other property to move in interstate commerce. This legislation is also different from the legislation in those cases where, strictly speaking, there are police regulations within the field of interstate commerce. Neither does it come within the character of legislation as to something obnoxious inherently in the subject matter of transportation. Neither does it deal with private contracts, which when carried into execution directly constitutes a burden on interstate commerce, such as for instance the anti-trust legislation. I realize also that this legislation does not come within the class of cases dealing with legislation intended to aid the states in the field of intrastate commerce, such as the Webb-Kenyon Law (27 U.S.C.A. § 122) and the Ashurst-Sumners Act, 49 Stat. 494 (49 U.S.C.A. §§ 61–64). But, on the other hand, I am of the opinion that the legislation does not deal with the production of commodities manufactured, or grown, or mined. But it does deal with commerce of an interstate or foreign character as affected by economic conditions which do directly affect interstate commerce and constitute an oppressive burden thereon. The legislation deals with the distribution in interstate and foreign commerce of commodities grown on the soil, to the end that commerce may be maintained, built up, fostered, and guarded. These are proper matters of national concern, and when the carrying on of that commerce under existing conditions without regulation of the kind proposed by the act constitutes a direct burden or oppression upon such commerce, there is constitutional authority for same. The regulation of commerce is not limited to the regulation of transportation, but by a long line of decisions includes legislative authority over dealings and transactions which pass through the channels of interstate and foreign commerce. The purpose of the legislation is to relieve a national economic emergency by increasing agricultural purchasing power. There is no attempt to regulate the growing, planting, cultivation, gathering, or packing of citrus fruit, nor of the price of the materials used in productive agriculture, nor of the price below which such articles so grown shall not be sold.

Point No. 7 of defendant's brief deals with the alleged deprivation of property without due process of law, and without just compensation. The property itself is not taken away from the owner by the legislation. The right to handle the citrus fruit is regulated, and this right of regulation, in my opinion, with the reasonableness thrown around the issuance of the order, prevents it being held to violate the provisions of the Constitution dealt with in this point No. 7, to wit, the Fifth Amendment of the Constitution. Section 8c (3), 7 U.S.C.A. § 608c (3), provides for notice and hearing, and section 8c (8), 7 U.S.C.A. § 608c (8), prescribes the condition precedent requiring the voluntary approval by at least 50 per cent of the handlers. Furthermore, the order must be determined to have been approved or favored by two-thirds of the producers, or by volume as prescribed in section 8c (8) (A and B), 7 U.S.C.A. § 608c (8) (A, B). Furthermore, there must be a conformity of the final order of the Secretary to the voluntary agreement as prescribed by section 8c (10), 7 U.S.C.A. § 608c (10).

Much of the defendant's case is built around the proposition that an injury is worked to this particular defendant as typical of the handlers of the fruit of the Indian River section as distinguished from the Ridge section of Florida. This has given me a good deal of concern. My conclusion is that where the authority to issue the order exists, and reasonable precautions are prescribed by the Act itself, and such conditions have been complied with, an inequity or wrong to a particular handler should not militate against the effectiveness of the order. My opinion is that the order is a valid one, and being such, a handler who violates the provisions of the order is not entitled to set up alleged inequities so far as it individually is concerned as against the effectiveness of a duly issued and authorized order. These matters, if determined, could be corrected when brought to the attention of the Secretary by an amendment to the order. If a particular handler still feels itself aggrieved, there may exist the right to liti-

152

gate the reasonableness of the administrative action of the local pro rate committee. But if that is sought to be done, such litigation does not justify the courts in restraining the operation of the effectiveness of a valid order, and such litigation should be confined, if warranted at all, to an attack directly involving the affairs of the particular handler, and does not warrant the injunctive powers of the courts being used to strike down an order of the Secretary validly and with authority issued.

Point No. 8 I have already discussed.

What I have said I think sufficiently states my views as not sustaining points 9 and 10 with regard to the alleged monopoly, and the alleged changed conditions. The motion to dismiss should be overruled, and also the motion to dissolve the temporary restraining order. Orders should be drawn accordingly.

I am convinced that the case of United States v. David Buttrick Co. (D.C.) 15 F. Supp. 655, is not decisive of this case. Taxation is not involved in this case. I am also convinced that the instant case is distinguishable from the Buttrick Case, supra, and other cases cited by defendant's counsel. The order involved is not designed to regulate and control agricultural production in my opinion. I am also convinced that the case of Ganley v. Wallace (D. C.) 17 F.Supp. 115, is not in point. The order of the Secretary in the Ganley Case classified and fixed prices to be paid the producer in the District of Columbia trade territory for milk, and it was held invalid to regulate and control the production of milk.