CHESTER C. FOSGATE CO. et al. v. KIRKLAND et al. (ROPER BROS., Inc., et al., Interveners).

District Court, S. D. Florida.
March 25, 1937.

154

Thomas B. Adams, of Jacksonville, Fla., and William N. Ellis and J. J. Parrish, Jr., both of Orlando, Fla., for plaintiffs and intervenors.

Herbert S. Phillips, U. S. Dist. Atty., of Tampa, Fla., John S. L. Yost, Sp. Asst. to Atty. Gen., of Washington, D. C., Doyle E. Carlton, of Tampa, Fla., S. L. Holland, of Bartow, .Fla., and E. G. Grimes and W. M. Smiley, both of Bradenton, Fla., for defendants.

AKERMAN, District Judge.

This cause is now before the court for the fourth time. It first came before the court upon application for temporary injunction as prayed for in the original bill, which temporary injunction against L. P. Kirkland and others, as the Florida Citrus Control Committee and against Henry A. Wallace, as Secretary of Agriculture, was granted January 28, 1937, effective until February 1, 1937.

The cause was next considered upon application of the plaintiffs to continue the temporary restraining order, and upon application of the defendant Henry A. Wallace to be dismissed because not a resident of this district, and upon objections of L. P. Kirkland and others to any extension of the injunction order, all of which resulted in a further order dated February 2, 1937, whereby the motion of defendant Wallace to be dismissed was granted, and whereby the application of the plaintiffs for a continuance of said injunction, as against said Control Committee, was denied because the committee had no enforcing powers, but the bill was retained as against the attacking motions in so far as the same might be deemed a motion to dismiss the bill.

The cause next came before the court upon the renewed application of the plaintiffs for temporary injunction based upon the original bill and an amendment to the original bill filed February 6, 1937, also upon a petition of intervention of Goldsmith Fruit Company, also upon petition of intervention by N. S. De Forest, also upon petition of intervention by Roper Brothers, Inc., and others, also upon objections by said District Attorney and others as new parties brought in by the amendment to said bill, to the granting of tem-

porary restraining order, also upon motions of some of said new defendants to be dismissed because not residents of this district, also upon objections of L. P. Kirkland and others as constituted the Control Committee to the granting of temporary injunction; all of which resulted in a further order made in this cause February 10, 1937, dismissing the intervention of Goldsmith Fruit Company, but allowing the other interventions to stand, dismissing all of the new defendants brought in by said amendment to the bill except Herbert S. Phillips, as United States District Attorney, continuing the application for temporary injunction until such future date as might be fixed by the court or by agreement of the parties, and requiring the defendant Herbert S. Phillips to make answer to the bill on March Rule Day, 1937.

L. P. Kirkland and others, constituting the Control Committee, on March 1, 1937, filed their motion to dismiss the bill of complaint as amended, and the defendant Herbert S. Phillips, as United States District Attorney, at the same time filed a like motion to dismiss. This, the fourth hearing, comes up on said motions to dismiss.

The original bill of Chester C. Fosgate Company and others attacked the validity of that certain citrus marketing agreement alleged to have been signed by Henry A. Wallace, Secretary of Agriculture, May 4, 1936, and the validity of that certain citrus handling order, known as order No. 7, issued by said Secretary of Agriculture May 4, 1936, and the validity of those sections, and parts of sections, of the Agricultural Adjustment Act, now 7 U.S.C.A. §§ 601 to 610, inclusive, upon which said marketing agreement and said handling order were predicated. It is alleged in the bill that each of the plaintiffs, save one a grower, is a handler of citrus fruits, who picks, packs, and ships citrus fruits from Florida in interstate commerce, and that, in consequence, each comes within the restrictive provisions provided for in said handling order, and that each has been restricted in the shipment of citrus fruits, pursuant to weekly prorate allotments made by said Citrus Control Committee, acting under the authority of said order and under the further orders and approvals made by said Secretary of Agriculture. The plaintiffs complain that the restrictions so imposed, have prevented them from operating their several citrus packing

houses as they normally would and have cut down their operations to from one to two days per week, causing them loss of business with citrus growers who would ordinarily contract with them, also causing disorganization of their labor forces and other damages. The bill also charged that said Agricultural Adjustment Act (as amended [7 U.S.C.A. § 601 et seq.]), the agreement and handling order complained of, are severally void, because in conflict with sundry provisions of the Federal Constitution and the amendments thereto. Finally, the bill charged that on account of nonrestrictions in the handling of citrus fruits from the Texas citrus area, and on account of several severe freezes in California occurring in January of this year, that the prorate restrictions provided for by said order No. 7 are now unreasonable and should not, in any event, be longer maintained. The bill prayed for a temporary and permanent injunction against the enforcement of said order, and for a decree declaring the same to be void, etc.

The amendment to the bill of complaint set up that the defendant Herbert S. Phillips, as United States District Attorney, in co-operation with the Special Assistant to the Attorney General and other attorneys representing the Secretary of Agriculture, were threatening to institute proceedings, civil and semicriminal, against the plaintiffs for alleged violations of said handling order and the allotments made by the control committee in pursuance thereof; that the said attorneys had already instituted one such proceeding against the Goldsmith Fruit Company of Fort Pierce, Fla., by a suit in the name of United States of America against said company, and such threats of enforcement added to the injuries sustained by the said plaintiffs, as more fully set out in the original bill, were causing irreparable injury to the plaintiffs; wherefore the plaintiffs renewed the application for a temporary injunction and permanent injunction and also prayed that the court enter a declaratory decree pursuant to 28 U.S.C.A. § 400, adjudging said marketing agreement and said handling order No. 7 to be void and of no effect.

Roper Brothers, Inc., and others, whose petitions of intervention were allowed to stand, made like complaints and prayed that the same relief, which might be awarded to the plaintiffs, be also awarded to them as intervenors.

156

■ The motions to dismiss now before the court on the part of Kirkland and others, as constituting the control committee, and on the part of Phillips, as United States District Attorney, admit as true all material facts which are well pleaded in the bill of complaint as amended. Payne v. Central Pacific R. Co., 255 U.S. 228, 232, 41 S.Ct. 314, 65 L.Ed. 598; Street v. Lincoln S. D. Co., 254 U.S. 88, 89, 41 S.Ct. 31, 65 L.Ed. 151, 10 A.L.R. 1548; Interstate Natural Gas Co. v. Gully (D.C.) 8 F.Supp. 174, affirmed 82 F.(2d) 145 (C.C.A.5).

■ The motion to dismiss filed by Kirkland and others, constituting the control committee, is a general motion attacking the jurisdiction of the court, asserting the absence of an indispensable party, and attacking the sufficiency of the bill as amended. The motion to dismiss filed by the defendant Phillips is likewise a general motion attacking the sufficiency of the bill and contending, among other things, as does the motion by Kirkland et al., that all contentions involved were determined adversely to the plaintiffs by a ruling made on February 25, 1937, by Hon. John W. Holland of the Miami Division of said court, in the suit of United States of America v. Goldsmith Fruit Company (D.C.) 19 F. Supp. 147. A letter from the said Judge to the several counsel engaged in that case, and purporting to set forth the views of said judge respecting the validity of said Agricultural Adjustment Act and said handling order No. 7, is attached to the motion to dismiss filed by said Phillips, as "Exhibit A." Passing the propriety of attempting to plead the subject-matter of said letter as a part of a motion to dismiss, I do not have before me the bill of complaint or the answer, or the evidence filed and taken in said suit of United States of America v. Goldsmith Fruit Company, although I gather from said letter and have been informed by the argument of defendants' counsel that the Hon. John W. Holland, upon the pleadings and evidence before him, entertains a view that said Agricultural Adjustment Act and said handling order are in all respects valid and binding. If the present case had now come before me as a new proceeding after the Goldsmith Case had been heard and ruled upon by Judge Holland, I would have been much inclined to follow his views in order to make the opinions and holdings of the several judges of this district harmonious where possible, but it appears by this rec-

ord that the proceedings before Judge Holland were not filed until February 4, 1937, and that his ruling as evidenced by said joint letter to counsel was not made until February 25, 1937; whereas in this cause I had previously indicated my view to be that said Agricultural Adjustment Act was void and that said marketing agreement was void and said handling order also void, because by my order of February 2, 1937, I had sustained the bill of complaint as against attacks contained in all of the motions and objections up to that time interposed by the defendants, and by my order made in this cause on February 10, 1937, I again sustained the bill of complaint as amended as against the further motions attacking the same and required Herbert S. Phillips, as United States District Attorney, to answer the bill as amended on or before March Rule Day. Having previously made such orders in this cause, I do not feel myself bound, either on account of comity, or otherwise, to follow the contrary views of Judge Holland. In the case of Interstate Natural Gas Co. v. Gully (D.C.) 8 F.Supp. 174, 176, District Judge Holmes, now member of the Court of Appeals, Fifth Circuit, said: "As men must be just before they are generous, courts must dispense justice rather than comity, if the one endangers the other." This principle seems to require that I now follow my own independent judgment as to the several contentions of law presented by the pleadings in this cause.

■ A preliminary contention made by the motion of Kirkland et al., as control committee, is that Secretary Wallace is an indispensable party, without whose presence in this suit no relief can be granted to the plaintiffs. That contention is without merit. Similar contentions were made and overruled in the following cases: Yarnell v. Hillsborough Packing Co., 70 F. (2d) 435 (C.C.A.5), Ryan v. Amazon Petroleum Co., 71 F.(2d) 1, 4 (C.C.A.5); Rood v. Goodman, 83 F.(2d) 28, 31 (C.C.A. 5).

■ It is also contended by the defendants constituting the control committee that plaintiffs should first pursue their administrative remedies provided for by the Agricultural Adjustment Act, such as found in 7 U.S.C.A. § 608c (15), before resorting to a court of equity for relief. In the first place it is my opinion, for reasons hereinafter stated, that all of the Agricul-

tural Adjustment Act, relating to the marketing agreement and handling order complained of, is void, with the result that the administrative provisions of said act urged by the defendant must fall with the other parts thereof. United States v. David Buttrick Company (D.C.) 15 F.Supp. 655, text 659, supporting the sixth headnote. It is further my view that the attacks made by the bill and amendment thereto upon the marketing agreement and handling order No. 7, predicated upon sundry provisions of the Federal Constitution and amendments thereto, are *questions of law* and *not administrative questions,* with the result that the Secretary of Agriculture has, in any event, no jurisdiction or authority to determine such questions. This was the view taken by the Fifth Circuit Court of Appeals in the case of Gully v. Interstate Natural Gas Co., 82 F.(2d) 145, first headnote and supporting text. The Supreme Court of the United States denied certiorari in the Gully Case, 298 U.S. 688, 56 S.Ct. 958, 80 L.Ed. 1407.

There are still other fundamental reasons why the so-called administrative remedies do not exist or are insufficient to displace the power of a court of equity to give relief. It appears by section 2 of the amendment to the bill and by the copy of petition attached thereto that there are now pending before the Secretary of Agriculture petitions by several of the plaintiffs and interveners for cancellation or modification of handling order No. 7; also that by such petitions it is charged that the statutory consent of 50 per cent. of handlers (7 U.S.C.A. § 608c (8), as a condition precedent to the making of the order, was not obtained. The so-called administrative provisions of the Agricultural Adjustment Act entirely dispense with the right of trial by jury guaranteed by the Seventh Amendment to the Federal Constitution as applied to the determination of such questions as are embodied in said petitions.

It is a further fundamental element of due process of law that no judge shall try his own case. Sections 608b and 608c of 7 U.S.C.A. require that the Secretary of Agriculture shall be one of the contracting parties to any marketing agreement executed pursuant to the act, and yet the Secretary is set up as the judge to try issues of act and issues of law attacking the validity of such an agreement.

The original objections of L. P. Kirkland et al., presented before me February 1 and 2, 1937, and filed with the clerk February 8, 1937, had attached thereto as "Exhibit A" a copy of certain regulations adopted by the Secretary and approved by the President for hearing and determining such petitions as referred to in the amendment to the bill filed in this case. Those regulations were published in Federal Register, and by act of Congress the court is required to take judicial notice thereof. By those regulations (section 303) the Secretary to whom such a petition is addressed is deemed to be the defendant or respondent and is to be represented by counsel adverse to the petitioner. Yet the hearing is to be conducted (section 302) by the Secretary or by a "Presiding Officer" or "such officer or employee of the Department as he may designate for the purpose." A code of procedure is then provided by said regulations adopted by the Secretary and approved by the President, prescribing how petitions shall be framed and filed, hearings conducted, evidence taken, etc. After the hearing is completed (section 312), the "Presiding Officer" transmits all of the record including the evidence taken to the office of the "Hearing Clerk" in Washington, D. C. The petitioner is accorded the right to file a brief in support of his contentions. In the course of time the Secretary (section 314) is required to "render his decision based upon the record, by making such final rulings upon the prayers of the petition as may be proper and in accordance with the law." By virtue of the Agricultural Adjustment Act the Secretary of Agriculture is now undertaking to supervise various branches of agriculture, horticulture, stock raising, and dairying in various parts of the United States. Before these multitudinous duties were taken over, he already had a great multitude of official duties to perform by virtue of prior enactments. Thus, in the very nature of the case a review of a record built up under such regulations as above referred to, must necessarily be reviewed and submitted to him by some one of his many subordinates, whom the petitioner and petitioner's attorneys in such case never see and never know. "The general rule undoubtedly is that Judicial Offices must be exercised in person, and that a Judge cannot delegate his authority to another" 6 R.C.L. 172. Such procedure

whereby the rights, properties, and liberties of citrus handlers and citrus growers are determined, is not due process of law guaranteed by the Fifth Amendment to the Federal Constitution. Moreover, such judicial power vested in such administrative officer and his subordinates is in my opinion an encroachment on the judicial branch of the government as defined by article 3 of the Federal Constitution. O'Donoghue v. United States, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356. Otto v. Harllee, 119 Fla. 266, 161 So. 402, and text supporting fourth headnote. Ponder v. Graham, 4 Fla. 23, 42, 43.

■ It is further contended by Kirkland et al., as well as by the District Attorney, that this court has no power to grant any relief on account of anything complained of in the bill of complaint and amendment thereto on the ground that neither the Secretary of Agriculture nor the Attorney General of the United States has directed Herbert S. Phillips, as United States District Attorney for this district, to institute proceedings against any of the plaintiffs or interveners. I cannot agree with that contention. The bill of complaint and amendment thereto, viz., the amendment filed February 6, 1937, show that all of the defendants, that is to say, those constituting the control committee and also the defendant Phillips, as United States District Attorney, are contending that the Agricultural Adjustment Act is valid in its entirety, also that the alleged handling order and the alleged marketing agreement are valid in all respects and that the plaintiffs and interveners are severally bound by the weekly pro rate of fruit allotted to them severally upon the recommendation of the control committee and approved by the Secretary of Agriculture. It further appears by said pleadings of the plaintiffs that one proceeding was previously instituted and is still pending against the plaintiffs Mr. and Mrs. Ivey, pursuant to 7 U.S.C.A. § 608a, subd. (7), also that the defendant Phillips, as District Attorney, joined by his assistant and other attorneys representing the Department of Agriculture, had instituted an injunction suit against Goldsmith Fruit Company, as previously mentioned. Indeed, each of the motions now under consideration asserts that the ruling made by Judge Holland on February 25, 1937, has already decided all of the contentions made by the plaintiffs in this cause, in favor of the Government, or rather in favor of the power and authority of the Secretary of Agriculture and said control committee. In such circumstances the enforcement of said Agricultural Adjustment Act and of said marketing agreement and handling order has proceeded beyond the mere stage of intention on the part of the defendants. Certainly the matter has proceeded to the point where it can be truly said that there is a "case" or "controversy" pending between the plaintiffs and interveners on one side and the defendants on the other. The plaintiffs show by their pleadings that the injuries from the activity of the defendants are not only threatened, but are now being suffered and are of such a character as to be irreparable. "Prevention of impending injury by unlawful action is a well-recognized function of courts of equity." Pierce v. Society of Sisters, 268 U.S. 510, 536, 45 S.Ct. 571, 574, 69 L.Ed. 1070, 1078, 39 A.L.R. 468; Ganley v. Wallace (D. C.) 17 F.Supp. 115, 118.

■ A further inquiry is whether plaintiffs are entitled to a declaratory decree pursuant to 28 U.S.C.A. § 400. On that branch of the case the decision of Judge Tuttle in the case of Black v. Little (D.C.) 8 F.Supp. 867, seems to be very much in point. The decision in that case was rendered upon motion to dismiss a bill praying for injunction against the enforcement of the Agricultural Adjustment Act and praying for a declaratory decree. The defendants in the case were Hugh A. Little acting as Market Administrator under the act, also his two assistants, and Gregory H. Frederick, United States District Attorney. The defendants now before the court in this suit occupy the same or similar positions. The court noted that the bill did not allege that the defendant District Attorney had instituted or threatened to institute any proceedings civil or criminal against the plaintiffs and that it did not appear that the other defendants had any power so to do. Judge Tuttle reached the same conclusion which has heretofore been reached by this court, i. e. that the circumstances did not justify an immediate temporary injunction. Nevertheless he did find that because the defendants asserted the validity of the Agricultural Adjustment Act and were insisting on compliance therewith that there existed a "controversy" between the parties sufficient to warrant the court in giving relief under the late Federal Declaratory Judgment Act. Judge Tuttle

followed as a precedent in that behalf the decision of the Supreme Court in Nashville, Chattanooga, etc., R. v. Wallace, 288 U.S. 249, 53 S.Ct. 345, 77 L.Ed. 730, 87 A.L. R. 1191. In the Wallace Case the plaintiff contended that a certain state statute requiring the payment of an excise tax on gasoline was unconstitutional, but that the defendants as public officers charged with the duty of enforcing the statutes asserted that such statutes applied to the plaintiff and that they were demanding payment of the tax. The case at bar is substantially a parallel situation, for here the defendants are not only insisting upon the validity of the statute and demanding compliance therewith by the plaintiffs, but the control committee in addition are asserting the right to collect and are demanding from the plaintiffs payment of seven-eighths of a cent on each box of fruit shipped in interstate commerce to defray the cost of administering the handling order. The conclusion reached by Judge Tuttle as shown by the third headnote of Black v. Little and the supporting text was that the bill in the case before him was sustainable as showing the right in the plaintiffs to have a declaratory decree rendered on the question of the legality or illegality of the Agricultural Adjustment Act, and in consequence he denied the motion to dismiss even though he also held that the situation did not warrant the immediate granting of a temporary injunction.

The decision in Black v. Little has been followed to such an extent that the rules therein laid down may now be regarded as settled. Judge Tuttle's decision was followed and applied by District Judge Kennerly in Ohio Casualty Insurance Company v. Plummer (D.C.) 13 F.Supp. 169. Also by Judge Patterson in Mitchell & Weber Inc. v. Williamsbridge Mills, Inc. (D.C.) 14 F.Supp. 954, 957. Judge Patterson held that under the Declaratory Judgment Act a prayer for declaratory decree may be joined with a prayer for injunctive relief.

In Gully v. Interstate Natural Gas Company, 82 F.(2d) 145, 149, the Fifth Circuit Court of Appeals cited and followed Black v. Little, together with other authorities. Circuit Judge Hutcheson, delivering the opinion of the court, pointed out the remedial character of the Declaratory Judgment Act, and held that in an appropriate case a court may take jurisdiction under that statute and "grant the relief of declaration, either *before* or after the stage of relief by coercion has been reached." (Italics supplied.) Judge Hutcheson further said: "The purpose of the statute is, we think, wise and benificent. It will, if applied in accordance with its terms, effect a profound, a far-reaching, a greatly to be desired procedural reform." Those pronouncements, coupled with the approval of Judge Tuttle's decision in the case of Black v. Little, show that the present case is an appropriate one for the application of the Declaratory Judgment Act. In the late case of Aetna Life Insurance Company v. Haworth, 57 S.Ct. 461, 81 L.Ed. ——, decided March 1, 1937, the United States Supreme Court followed Nashville, Chattanooga & St. L. R. Co. v. Wallace, supra, 288 U.S. 249, 264, 53 S.Ct. 345, 77 L.Ed. 730, 736, 87 A.L.R. 1191, in the construction of 28 U.S.C.A. § 400. The court also cited with approval the case of Gully v. Interstate Natural Gas Co. (C.C.A.5th) 82 F. (2d) 145, 149.

The plaintiffs and interveners now before the court show by their pleadings that they have large investments in their packing house facilities, and the Agricultural Adjustment Act bristles with penalties and forfeitures for violations of any handling order that may be issued by the Secretary of Agriculture pursuant thereto. It is, therefore, highly important to the several businesses of the plaintiffs and interveners that they be relieved from the uncertainty of liability, and that the cloud of possible forfeiture or the imposition of heavy penalties be lifted.

The two decisions of Judge Holmes, affirmed by the Court of Appeals decision just cited, were Interstate Natural Gas Company v. Gully (D.C.) 8 F.Supp. 174, and Memphis Natural Gas Co. v. Gully (D.C.) 8 F.Supp. 169. Judge Holmes, in overruling motions to dismiss, not only held that the Declaratory Judgment Act was applicable, but he proceeded to pass upon the merits of the bills and granted interlocutory injunctions. The plaintiffs in those cases were claiming exemption from state taxation pursuant to a certain provision of the Mississippi Constitution. So here, it is appropriate that the court should proceed to examine the merits of the attacks made in the plaintiffs' bill, as amended, upon the Agricultural Adjustment Act, the marketing agreement, and the handling order.

■ The plaintiffs by their bill of complaint, as amended, have attacked the validity of the Agricultural Adjustment Act,. the marketing agreement, and the handling order both from a factual standpoint and from a standpoint of law. The motions to dismiss interposed by the defendants now before the court admit the facts set up by the plaintiffs as the basis of their factual attack. The motions to dismiss in effect join issue upon the questions of law raised by the bill, as amended. In my opinion the facts alleged, if true, show that the act, the agreement, and the order are severally void. It is my further opinion that the attacks made from the standpoint of law are also well founded.

Section 11 of the original bill sets up that the handlers of 50 per cent. of the volume of citrus fruits covered or to be covered by the handling order, i. e., order No. 7, issued by the Secretary on May 4, 1936, never did sign the marketing agreement, and that in consequence the Secretary never acquired any jurisdiction or power to issue the handling order. Simmons v. Fessenden, 111 Fla. 83, 149 So. 21, 95 A.L.R. 112.

In connection with those averments it is recited by the printed copy of the handling order attached to the bill of complaint as Exhibit 2 (page 5 of said exhibit), that the alleged marketing agreement was signed by shippers who, during the shipping season of 1934-1935, handled more than 50 per cent. of the volume of oranges, grapefruit, and tangerines marketed during that season in the current of interstate commerce in the Continental United States and Canada. The handling order does not pretend to claim that the handlers of 50 per cent. of the volume of the Florida citrus fruits shipped in such commerce for the season of 1936-1937 signed such agreement. In any event, the bill alleges, section 11, that the signatures by the statutory 50 per cent. of handlers was not obtained. Since the motions to dismiss admit. this fact, it cannot be assumed that the same persons, firms, and corporations. who handled fruit in the 1934-1935 season also handled fruit in the 1936-1937 season or that the proportions which they severally handled remained the same during the current marketing season. Section 608c, subdivision (8), of title 7 U.S.C.A. plainly provides in part: "No order issued pursuant to this section shall become effective until the handlers * * * of not less than 50 per centum of the volume of the commodity or product thereof *covered by such order* * * * have signed a marketing agreement, entered into pursuant to section 608b of this title." (Italics supplied.)

It is contended by the defendants that if this statute be so construed as to require an agreement by the handlers of 50 per cent. of the volume of the crop *to be* handled pursuant to such .order that the statute would become impracticable and impossible of fulfillment. That may be so, but the defect is one of legislation, which cannot be cured by judicial decision. If the court were at liberty to approve the selection of a season two years back as the basis of such an agreement, it could with equal propriety approve the selection of a period five years back as the basis for procuring the agreement of handlers of 50 per cent. of the volume, etc. It appears to the court that the question of fact thus raised is sufficient of itself to destroy the validity of the marketing agreement and the handling order predicated thereon. Recitals contained in the handling order itself bear out the averments of the bill in that behalf.

■ The plaintiffs contend, by section 18 of the original bill, that section 608c (8) of title 7 U.S.C.A. is void, and in derogation of article 1 of the Federal Constitution, in that same undertakes to vest in the handlers of 50 per cent. of the volume of fruit to be effected by the marketing agreement and order, the power to legislate, or rather to make an agreement to be incorporated in an order having the effect_ of law, bindng upon all handlers and producers of Florida citrus fruit. The defendants assert that this contention is without merit, and they rely upon sections 608b, 608c (3) and (4), as showing that the Secretary could determine the terms of, issue and enforce a handling order, irrespective of any consent by the handlers, as provided for in section 608c (6), title 7 U.S.C.A. It is my view, however, that when all parts of section 608c, title 7 U.S.C.A., are considered, such contention of the defendants is untenable. This is made clearly to appear by the provisions of subdivisions (9) and (10) of section 608c, title 7 U.S.C.A. Subdivision (9) provides an alternative method for giving authority to issue a handling order, in the event that the statutory 50 per cent. of handlers defined by subdivision (8) of that section refuse to sign. The alternative procedure thus provided, however, is that the Secretary may issue

such an order in such circumstances only in the event the President determines:

"(A) That the refusal or failure to sign a marketing agreement * *. * by the handlers * * * tends to prevent the effectuation of the declared policy of this title with respect to such commodity or product, and

"(B) That the issuance of such order is the only practical means of advancing the interests of the producers of such commodity pursuant to the declared policy."

Further parts of subdivision (9) define other things to be found by the President. And so it is that if the President should not intervene, it is not possible for the Secretary to issue any order whatsoever, without procuring an agreement signed by the statutory 50 per cent. of handlers. The same conclusion is borne out by subdivision (10), for in that section it shows that the execution of the agreement must have preceded the issuance of such an order, inasmuch as said subdivision (10) requires that: "No order shall be issued under this section unless it regulates the handling of the commodity or product covered thereby in· the same manner as, and is made applicable only to persons in the respective classes of industrial or commercial activity specified in, a marketing agreement upon which a hearing has been held."

The relationship thus defined for 50 per cent. of the handlers is similar to that of one legislative branch in a legislature during the process of enacting a law. Neither House of the Legislature can enact a bill independent of the other; nor can both enact a law independent of the Governor's veto. Since the marketing agreement must be signed by 50 per cent. of handlers, and also by the Secretary, each occupies the position of a separate branch of the legislative body. Such delegation of authority to a part of those engaged in a particular industry has lately been condemned by several decisions of the Supreme Court of the United States, and by several decisions of the State Supreme Courts. Panama Refining Co. v. Ryan, 293 U.S. 388, 420, 55 S.Ct. 241, 248, 79 L.Ed. 446, 458 and 459; Schechter Poultry Corp. v. U. S., 295 U.S. 495, 529, 536, 537, 55 S.Ct. 837, 842, 846, 79 L.Ed. 1570, 1580, 1583, 1584, 97 A.L.R. 947; Carter v. Carter Coal Co., 298 U.S. 238, 311, 56 S. Ct. 855, 872, 80 L.Ed. 1160, 1189; Gibson Auto Co. v. Finnegan, 217 Wis. 401, 259 N.W. 420, 423, fifth headnote and supporting text; State v. Matson Co., 182 Wash. 507, 47 P.(2d) 1003; Van Winkle v. Fred Meyer, Inc., 151 Or. 455, 49 P.(2d) 1140.

In the Carter v. Carter Coal Co. Case, 298 U.S. 238, at page 311, 56 S.Ct. 855, 873, 80 L.Ed. 1160, at page 1189, the court on this subject, among other things, said: "The power conferred upon the majority is, in effect, the power to regulate the affairs of an unwilling minority. This is legislative delegation in its most obnoxious. form. * * * A statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property. The delegation is so clearly arbitrary, and so clearly a denial of rights safe-guarded by the due process clause of the Fifth Amendment, that it is unnecessary to do more than refer to decisions of this court which foreclose the question."

In Gibson Auto Co. v.. Finnigan, the Wisconsin court made similar observations and pointed out that without the consent of a particular group interested in the industry no code (here marketing agreement) could go into effect, and that it was "difficult to conceive of a more complete abdication of legislative power."

The evils of such attempted delegation of legislative power are illustrated by the averments of sections 9 and 16 of the original bill in this case, showing ways and means whereby certain citrus handlers, competitors of the plaintiffs, have been able to so manipulate the handling order and the allotments made thereunder, as to secure unwarranted advantages, and practically force plaintiffs and others similarly situated out of business. To permit the handlers of 50 per cent. of the volume of any commodity to have such power in the making of a marketing agreement, which when approved by an order of some executive official shall have the force of law, is · to my mind exactly what the Supreme Court said it is, namely, "Legislative delegation in its most obnoxious form," and in consequence, constitutes a violation of the Fifth Amendment to the Federal Constitution.

A further contention of the plaintiffs, by section 14 of their original bill, is that the provisions of the Agricultural Adjustment Act, particularly sections 608b

and 608c, title 7 U.S.C.A., undertaking to authorize the approval of such marketing agreement by the Secretary of Agriculture, and undertaking to define his powers and duties, are severally void, because they undertake to delegate to said Secretary, legislative powers, contrary to article 1 of the Federal Constitution. Against this contention it is urged by counsel for the defendants that the Agricultural Adjustment Act, particularly section 608c, subdivision (6), defines a definite program which must be followed by the Secretary, if he acts at all, and that therefore what the Secretary now undertakes to do under the act does not come within the unwarranted delegation of legislative authority condemned by the Supreme Court in Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446, and Schechter Poultry Corp. v. U. S., 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947. It seems to me, however, that a comparison of the provisions of the Agricultural Act, as it now stands, with the acts involved in the Ryan Case and Schechter Case, will show a complete analogy to such an extent that the objection now under consideration is here just as tenable as it was in those decided cases. The entire framework of the Agricultural Adjustment Act is based on section 2 thereof, which is now section 602, title 7 U.S.C.A. That section undertakes to define a declared policy of bringing about a parity between the prices received by producers and the prices paid by them for commodities which they use. All of the machinery subsequently provided for in the act looks to that object and purpose as the guiding star, and it leaves to the Secretary unlimited power and discretion to devise ways and means for accomplishing such declared purpose. For example, by section 8b of the act, now section 608b, title 7 U.S.C.A., the Secretary is given authority to enter into a marketing agreement only, if and when he may conclude that such marketing agreement will "effectuate the declared policy of this Chapter." The same thing is found in section 8c (3) of the statute, now section 608c (3), title 7 U.S.C.A., which provides: "Whenever the Secretary of Agriculture has reason to believe that the issuance of an order will tend to effectuate the declared policy of this chapter with respect to any commodity or product * * * he shall give due notice of and an opportunity for a hearing upon a proposed order." Thus it is that no movement of that sort can be initiated by any one except the Secretary. Congress did not undertake to define what conditions should exist to necessitate and require action by the Secretary. He is a law unto himself in that behalf. The only guide or standard is the definition of the declared policy contained in section 2 of the act. These observations are not weakened by anything contained in subdivision (6) of section 8c of the act (section 608c (6), title 7 U.S.C.A.). Paragraphs A, B, and C respectively start out as follows:

(A) "Limiting, or providing methods for the limitation of, the total quantity of any such commodity * * *"

(B) "Allotting, or providing methods for allotting, the amount of such commodity or product, or any grade, size, or quality thereof, which each handler may purchase," etc.

(C) "Allotting, or providing methods for allotting, the amount of any such commodity or product, or any grade, size, or quality thereof, which each handler may market," etc.

These clauses, therefore, leave it up to the Secretary and the agreeing 50 per cent. of the handlers to determine the *methods* in every instance. After the whole situation has been reviewed with the handlers, or rather not less than fifty per cent. of them, the Secretary still holds the veto power by virtue of his right to execute or not execute the proposed marketing agreement as a contracting party. After the agreement is executed, he then issues an order, which order must follow the terms of the agreement as required by subdivision (10) of section 8c of the act (7 U.S.C.A. § 608c (10); but in all these matters no yardstick of any sort binds the Secretary. He determines in the first instance whether there is any *necessity* for any sort of handling arrangement whereby the shipments shall be restricted as to quantities and grades; and after he shall have determined the necessity, he then dictates what the limitations and methods shall be. Under these circumstances the unlimited delegation of legislative power is just as complete as in the Ryan Case or the Schechter Case. Substantially the only difference is that here the Secretary is given unlimited powers of legislation, save the check of the required contract consent of 50 per cent. of the handlers, instead of vesting such power in the President, to be concurred in by

industrial groups in the process of Code making defined by the NRA.

My conclusion, therefore, is that the Agricultural Adjustment Act, the marketing agreement, and the handling order are severally void, on account of the delegation of legislative power to the Secretary of Agriculture, contrary to article 1 of the Federal Constitution, and contrary, to the Fifth Amendment to that instrument.

 It is 'next contended by section 13 of the bill of complaint that the end and purpose of the Agricultural Adjustment Act as defined by the declaration of policy contained in section 2 thereof (7 U.S.C.A. § 602) was to establish such balance between production and consumption of agricultural commodities, here citrus fruits, and the marketing conditions therefor "as will reestablish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period." It is further urged by the plaintiffs that such defined purpose of the act and of the marketing agreement and of the handling order is outside of any express power vested in Congress and that in consequence the act, marketing agreement, and order violate the Tenth Amendment to the Federal Constitution. In my opinion such attack is well founded. As I construe the decision of the 'Supreme Court of the United States in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 318, 80 L.Ed. 477, 102 A.L.R. 914, the court squarely held (297 U.S. 1, text 64, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914) that the purpose of said act "is the control of agricultural production, a purely local activity, in an effort to raise the prices paid the farmer." In that case the court further said: "The act invades the reserved rights of the states. It is a statutory plan to regulate and control agricultural production, a matter beyond the powers delegated to the federal government. ·* * * To forestall any suggestion to the contrary, the Tenth Amendment was adopted. The same proposition, otherwise stated, is that powers not granted are prohibited. None to regulate agricultural production is given, and therefore legislation by Congress for that purpose is forbidden." This is unmistakable language and shows that the court condemned the act in its entirety not merely the provisions thereof dealing with processing taxes. In the case of Rickert

Rice Mills v. Fontenot, 297 U.S. 110, 113, 56 S.Ct. 374, 375, 80 L.Ed. 513, 515, the court again had the act under consideration after certain amendments had been made in 1935, and there the court again said: "It [meaning the Act] remains a means for effectuating the regulation of agricultural production, a matter not within the powers of Congress."

Prior to these, two decisions Judge Kennerly, in the case of Wallace v. Smith (D. C.) 11 F.Supp. 782, had held the Agricultural Adjustment Act void on the ground of an unconstitutional delegation of legislative authority and he cited in that behalf the Ryan Case and the Schechter Case. If the Butler Case had been decided prior to his opinion he undoubtedly would have followed that case also in reaching that conclusion. Since the decision in the Butler Case a number of lower courts have followed it in the construction of the Agricultural Adjustment Act and similar legislation holding all such acts void and interpreting the Butler decision as holding the act void in its entirety rather than as merely applied to the processing tax provisions thereof. Such cases are United States v. David Buttrick Co. (D.C.) 15 F.Supp. 655; Ganley v. Wallace (D.C.) 17 F.Supp. 115; Franklin Township v. Tugwell, 66 App.D.C. 42, 85 F.(2d) 208, 220–222; Burco Co. v. Whitworth, 81 F.(2d) 721–739 (C.C.A.4); Smith v. Glenn (D.C.) 16 F.Supp. 83; Taylor v. Robertson (D.C.) 16 F.Supp. 801. The decision of the Fifth Circuit Court of Appeals in the case of Speh v. Bullard, 83 F.(2d) 809 is also in accord for the court there applied the doctrine of a trust ex maleficio, Pomeroy (4th Ed.) § 1053, and impliedly at least recognized that the Supreme Court in the Butler Case held the Agricultural Adjustment Act void in its entirety.

 Defendants' counsel have attempted to justify the act on the ground of regulating interstate commerce, but such contentions have in the past failed when the end and purpose sought to be accomplished, just as here, were not some object within the power of Congress, but dealt with some subject-matter reserved to the states. The Child Labor Cases are outstanding examples in 'this behalf. Hammer v. Dagenhart, 247 U.S. 251, 275, 38 S.Ct. 529, 62 L.Ed. 1101, 3 'A.L.R. 649, Ann.Cas.1918E, 724, Bailey v. Drexel Furniture Co., 259 U. S. 20, 37, 42 S.Ct. 449, 450, 66 L.Ed. 817, 21 A.L.R. 1432. .The doctrines of those cases

were fully approved in United States v. Butler, supra, also in Carter v. Carter Coal Co., 298 U.S. 238, and 295, 56 S.Ct. 855, 865, 80 L.Ed. 1160. In the face of the declared policy contained in section 3 of this act there is less effort to disguise than was contained in the Acts condemned in the Child Labor Cases. In the great case of McCulloch v. Maryland, 4 Wheat. 316, 403, 4 L.Ed. 579, 601, Chief Justice Marshall said: "No political dreamer was ever wild enough to think of breaking down the lines which separate the States, and of compounding the American people into one common mass." In the case of Texas v. White, 7 Wall. 700, 725, 19 L.Ed. 227, 237, Chief Justice Chase delivering the opinion of the Court, among other things, said: "The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." These doctrines were reaffirmed in United States v. Butler and in Carter v. Carter Coal Company, hence the conclusion that Congress may not by a mere pretext at regulating interstate commerce invade and control the internal affairs of the states for any such purpose as defined in section 2 of the Agricultural Adjustment Act. The control of the citrus industry which the Federal Government has undertaken by means of the Agricultural Adjustment Act is an effort to do precisely what the Supreme Court has several times condemned, for instance, in Kidd v. Pearson, 128 U.S. 1, 26, 9 S.Ct. 6, 32 L.Ed. 346, 352, and Heisler v. Thomas Colliery Co., 260 U.S. 245, 43 S.Ct. 83, 67 L.Ed. 237, cited and quoted in Carter v. Carter Coal Company, 298 U.S. 238, at pages 299 and 302, 56 S. Ct. 855, 867, 869, 80 L.Ed. 1160, at pages 1182 and 1184.

A still further contention of the plaintiffs, based upon alleged facts, which are admitted by the motions to dismiss, is that the handling order, as administered by the defendants constituting the control committee and the Secretary of Agriculture, has been and is depriving them of their properties without due process of law, and without just compensation, contrary to the Fifth Amendment to the Federal Constitution. The principal averments of the bill in this behalf are found in sections 4, 5, 6, 6-a, 9, 10, and 16. Supplementary matters of fact are shown by the amendments to the bill of complaint.

Section 4 of the bill states the effect of the handling order and its administration upon the business of Chester C. Fosgate Company, one of the plaintiffs, and shows, among other things, that its record for the last several years has been the shipment of around one-half million boxes of citrus fruits; that it has a packing house with a daily capacity of from 5,000 to 6,000 boxes of fruit, but on the limited prorate basis recommended by the control committee, and approved by the Secretary, it has been able to operate during the prorate period from one to three days per week; that as a result its labor forces are disorganized and unable to earn enough to keep their families; that the growers who ordinarily contracted with the plaintiff have been forced to seek other outlets for the marketing of their fruit; that this plaintiff has been unable to supply its customers with whom it has heretofore customarily dealt in the Northern markets; that by manipulations of the marketing order plaintiff's competitors have secured unfair advantages on what is known as current control basis, and have been able to buy fruit from growers who, under normal conditions, would have dealt with the Fosgate Company.

Similar showing is made in section V of the bill with respect to others of the plaintiffs.

Section VI of the bill shows that plaintiff Pontucket Groves Company is a grower near Orlando, which, for the past five years, has customarily dealt with Chester C. Fosgate Company as its marketing outlet, but on account of restrictions in the matter of shipments imposed by the control committee and the Secretary plaintiff has been unable to deal with the Fosgate Company as it ordinarily would have done, and that said company, as a citrus grower, has sustained losses, as set out in detail.

Section VI-A of the bill shows that the plaintiffs G. L. Ivey and Hilda Ivey, his wife, operate a small packing house plant, but that the allotments to them by the control committee and the Secretary have been approximately forty to one hundred boxes per week, less than enough to operate one day each week. That with such limited operations they cannot earn enough to supply themselves with the necessities of life.

Sections IX and XVI of the bill further show that since the opening of the present marketing season there has been a shift from what the marketing order describes as past performance basis to current control basis, so that now, instead of 30 per cent.

at the beginning being on current control basis, and 70 per cent. on past performance basis, the ratio is 80 per cent. current control and 20 per cent. past performance. That the control group have so manipulated the provisions of the order that they are for the most part able to operate freely or at full capacity in their respective packing houses, while such handlers as the plaintiffs, still on past performance basis, are restricted to less than one-third of their capacity, to the great damage of themselves and the growers with whom they customarily contract. That those on a current control basis who have so succeeded in getting themselves into favorable positions are doing a profitable business, while the plaintiffs doing business alongside of them, and under similar circumstances, are being forced to sustain large financial losses. That the manipulations of the order have been such as to create in the hands of the current control group a present monopoly in the handling and marketing of citrus fruits for the current season. That the properties of the plaintiffs have been and are being confiscated, and their rights to contract destroyed, without due process of law, contrary to the Fifth Amendment to the Federal Constitution.

Sections IX and XVI go into further detail as to the ways and means whereby the group known as current control group of handlers have procured what is alleged to be a monopoly of the handling of citrus fruits now going out of the State of Florida. The amendment to the bill of complaint, particularly sections 2 and 3, assert that the insistence by the control committee and the District Attorney, coupled with threats of action against plaintiffs, have created an impending danger over the several businesses of the plaintiffs, impairing their credit, destroying their good will, by increasing the risk of doing any business in violation of the prorate allotments. For example, it is pointed out that if the act is held valid, that they may, under section 608a, subdivisions (7) and (5), be subjected to a forfeiture equal to three times the current market value of all fruits shipped in excess of the prorate allotments, and thus at the end of the shipping season find themselves wiped out by such forfeitures insisted upon at the suits of the Government. All of these matters of fact, well pleaded, are admitted by the motions to dismiss, and thus again, the bill and its

amendments amply present a "case" or a "controversy" entitling the plaintiffs to equitable relief, including a declaratory decree as to whether or not the parts of the Agricultural Act involved in this case, together with the Marketing Agreement and the Handling Order, are valid or void.

In the case of Lawton v. Steele, 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385, the court, speaking as to a state statute said: "The Legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations." That rule is equally applicable to an act of Congress such as is now under consideration.

In the leading case of Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 1071, 30 L.Ed. 220, the court laid down the following propositions which have been many times reiterated since that decision: "When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of *purely personal and arbitrary power.* * * * the fundamental rights to life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws, so that, in the famous language of the Massachusetts bill of rights, the government of the commonwealth 'may be a government of laws and not of men.' For, the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself. * * * Though the law itself be fair on its face, and impartial in appliance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still *within the prohibition of the constitution.*"

■ The principles declared in the Yick Wo Case in 1885 are just as applicable today as then. The provisions of the handling order here complained of, and the administration thereof, as described in the several paragraphs of the bill and the amendments above referred to, clearly come within the condemnation of the rules above quoted from the Yick Wo Case.

The same principle was reiterated in Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 1045, 29 A.L.R. 1446, where the court pointed out that liberty guaranteed by the Fourteenth Amendment (here the Fifth Amendment) "* * * denotes not merely freedom from bodily restraint but also the right of the individual to contract, *to engage in any of the common occupations of life, * * * and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.*" (Italics supplied.)

The averments of the bill and amendments thereto plainly show that the properties of the plaintiffs are not only being confiscated, but their rights of contract, both with growers and consumers in consuming areas, are being curtailed and cut off. All of these losses of property and property rights are being taken under color of the Agricultural Adjustment Act and the handling order without any compensation to these plaintiffs and interveners contrary to the due process clause of the Fifth Amendment to the Federal Constitution.

The case of Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785, 24 A.L.R. 1238, lately adhered to in Morehead v. People, 298 U.S. 587, 56 S.Ct. 918, 80 L.Ed. 1347, 103 A.L.R. 1445, reaffirms the liberty of contract guaranteed by the Fourteenth Amendment, and also by the Fifth Amendment.

■ It is another well-settled rule, as reiterated in Nashville, C. & St. L. Ry. Co. v. Walters, 294 U.S. 405, 415, 55 S.Ct. 486, 488, 79 L.Ed. 949, 955: "A statute *valid as to one set of facts* may be *invalid* as to another. A statute valid when enacted may become invalid by change in the conditions to which it is applied." And applying this principle to the admitted facts set up in the several paragraphs of the bill as above noted, it follows that these plaintiffs, under the facts so pleaded and admitted by the motions to dismiss, have a cause of complaint, irrespective of what might be the situation as applied to other facts and circumstances.

The fifteenth section of the bill of complaint presents a further proposition of changed conditions since the handling order was promulgated in May of 1936. That is to say, that Texas fruit has been moving all of the present season without any restrictions, and that California fruit was cut off 40 or 50 per cent. by the severe freezes which occurred in January, 1937; all with the result that there is no necessity for, and no justification for, any further restrictions on the movement of Florida fruit in interstate commerce. There is much merit in this contention, but since it is my opinion that the whole act and the whole scheme represented by the marketing agreement and handling order are void, it is not necessary to further analyze the situation in the light of such changed conditions.

For the several reasons pointed out in this opinion, I hold that the bill of complaint, as amended, states a case for equitable relief, and that the motions to dismiss should be denied. Proper order to that effect will be entered.